Argument on behalf of the appellant, Mr. Paul Escovedo, argument on behalf of the appellant, I'd like to first direct myself to the issue of duty, because it's an issue that's going to affect each of the three counts. Issue of what? Duty, Your Honor, or more precisely, the lack of it in this case. Claims recently cited to the court the case of Stearns v. Ridge Ambulance, a 2nd District case decided just a couple weeks ago. And the court stated, it was quoted from Sinkin's Supreme Court case, and it stated, The touchstone of this court's duty analysis is to ask whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff. I think that statement, and it is certainly accurate, the statement presupposes something. The statement presupposes a level of control on the part of a defendant that allows the law to turn to that defendant and say, You know, you should have been doing something here, and what you should have been doing should have been reasonable. That's where, in many different ways, the claim against a CGB breaks down. Let's talk about count one. Count one is the statement of common law duty. And there's a couple problems with the count. Number one, 414 is the expression of common law duty in Illinois. The cases say so. So counts two and counts one are, in a sense, superfluous or duplicate. If you're going by the 414 count, you don't have a common law negligence count. But if you're looking at common law negligence just as its own count, the problem is still a lack of duty because the relationship of the parties in this case was contractual. That's how CGB and HASBAC came together. And under the contract, HASBAC kept for itself the very matters of duty that are involved in this case. HASBAC kept for itself the duty to keep the property in good repair and order as defined by OSHA. HASBAC kept for itself the duty to perform the labor and do the equipment necessary to safely elevate, store, and transfer the grain. That's the very thing that's involved in this accident. HASBAC kept for itself the duty to maintain the equipment. And the equipment here is the bin and it's the conveyor. Whose duty is it to dry the corn to a suitable level? HASBAC. CGB says we need the corn dried to a certain level. Didn't CGB retain the authority to inspect it or to supervise the drying of it to a certain degree? To inspect it. They kept the opportunity because they're the grain dealer. They want to see what's being— Well, they want good dry grain, right? Right. CGB has an obligation to its grain depositors. It has an obligation to the farmers who invested their time and their efforts to grow this grain, produce it, and hopefully sell it at a profit. So the obligation of CGB is to them. So yes, they kept that duty. But HASBAC, as the owner of this bin—and keep in mind, HASBAC approached CGB and said we want to get this bin. CGB, which had an option to buy it—it didn't own it at the time. CGB, which had an option to buy it, said to HASBAC, which was its customer, let's see what we can do. And it worked out a deal where CGB basically bought the facility and then immediately turned around and sold it to HASBAC. HASBAC was the owner. HASBAC was the operator. Who had the permit? I'm sorry, Your Honor? Who had the permit? Who had the permit? We had the license. We had a federal and state license issued pursuant—let's talk on the federal side because I think that's one that's most relevant here. The license is issued by the federal government under the Federal Warehouse Act. And there's an agreement that you've seen that we talked about in the briefs under the Fairhouse Act. That wasn't a contract. What it really was is those were the conditions of licensing. But what's very clear from that warehouse agreement, those conditions, is that the obligations that HASBAC—excuse me, that CGB had, those were obligations that ran to the grain depositors. We took in their grain. We had to give it back to them. We had to give it back to them in the same amount. We had to give it back to them in the same quality. And so that's who we were looking to serve. And that's where our duties, if at all, ran, not to employees of HASBAC who was operating the bin. And they were entitled to operate it under an operating agreement, and everyone agreed to that. I was under the impression that when corn or grains were delivered, they had a certain moisture content, and then they were supposed to be dried. Are you telling the court that the grain came with an X amount of moisture, and then it had to be dried because it kept acquiring additional moisture while it was being stored? No, that's not the way it works. It comes in with an amount of moisture. The plaintiff's expert testified that the 2009 crop, and what was in the bin in 2010, in late July at the time of the accident, was the 2009 crop. The 2009 crop nationwide was incredibly poor. Poor and wet. By that, I mean wet, yes. Immaturity results in wetness. As a matter of fact, the testimony, Ken, was that the grain that was deposited by the HASBAC folks was far wetter than the grain that was in by CGM folks. The reason why I was asking the question is because you said that your responsibility was to give them back the grain in the same level of quality that they receive it, which doesn't sound totally accurate to me because if supposedly it's poor grain because it's wet, and you're supposed to dry it out and give it back to them, it seems to me you're giving them an improved product. Then I was inartful how I said it. If the grain comes in, it's not rotten. It has to leave not rotten. It can't be that. So it's a pass-fail? Is that what you're telling us? I don't know if the record speaks to it in those terms, Your Honor. The point is it could be X percentage moisture. It could leave X plus 5, but X plus 10 is failed. So as long as it's between X and X plus 10 or whatever arbitrary number you pick that suggests it's rotted or it's too moist. I think maybe this is the best way. What the farmer is looking to end up with is saleable grain, grain that he can pass for a profit to someone else. It's going to require a certain level of drying. However, and how wet it is comes in as it comes in will play a role in what needs to be done to it to get it to be a saleable condition. They don't sell the grain. It's wet grain. It's dried out. The number that was talked about was 15 percent to 16 percent. That's what was kept around. And so if it comes in really wet and grain came in as high as 33 percent, some haz-back grain, you've got to get that grain down to make it saleable. And what haz-back was doing, CGB, which is the grain dealer that buys and sells grain, would set the moisture levels. Haz-back's job, pursuant to contract, was to get that grain down. They were handling the grain. They were taking care of the grain. Are they the one paid for the cost of reducing the moisture level? Yes, they were. There was a percentage or there was a pennies per bushel, I think is the agreement describes it, pennies per bushel for doing the drying. Is it a question of fact as to whether or not the control in the contract relative to the levels of moisture and the ability to inspect and or test the product, a question of fact that it was within the realm of the jury to decide? I don't believe so, Your Honor. I mean, at all times, it was the responsibility of haz-back to handle, to control the grain. That's established by contract. That was their duty. And we can take a look at it, and if they wanted to come to us, which they never did, and say, hey, you know, we think we've got a problem here at this level, Shatner has no recollection whatsoever of ever going to in June or July of 2010 and saying we have a problem with the grain. So, no, it's not a question of fact, Your Honor. I mean, that's, haz-back, that was haz-back's job. That's part of what he was getting paid to do under this contract, under the way they set up this contract. I wanted to just touch back on the warehouse agreement for just a quick second. And that is, Professor Fields, who was plant safety expert in this case, recognized, and speaking of the Warehouse Act, and recognizing that that's a, the Warehouse Act is not a worker safety statute. It's a statute that was dealing with the integrity of the grain for purposes of protecting the farmers who produce the grain. He said, it's not, he said, I think very clearly, it's not the kind of statute that I'm interested in in this case. And he was the guy who was talking about safety. So, the warehouse agreement, I think we can put aside here. So, really, what we have here is a lack of control. You can apply the foreseeability test, you're going to come up with the same result of no duty here. But the fact of the matter is, you really don't even get to foreseeability if we didn't have control to do the things we were supposed to do. It's kind of like a, right in a car, you know, you're a passenger in a car. You may also be a driver. You may own a car, you may know everything there is to know about driving. But once you're the driver, you have no control of that car. And so, no duty. That was kind of the situation here. We had certain responsibilities under the contract. When grain came in, we weighed it. We tested it. We sampled it. So, we let them know what we've got here. When grain went out, we weighed it again. Why do you say we? Don't you mean HASBAC? No, I mean CGB. Those are CGB's responsibilities, Ernie. HASBAC's responsibilities were to operate the equipment, operate the bins, to move the grain from one bin to the other, to empty bins. Those were the things that were involved here. Did CGB set the moisture level? CGB sets the moisture level, yes. Right. And there was really no problem with setting it and no problem that couldn't have been dealt with, you know, by HASBAC coming back to say, Hey, we have a problem. We think maybe this is too moist. Is the bridging or the problem with the grain dependent on the level of moisture? In other words, is drier grain less apt to bridge or clog? You can say that. There's probably truth to that. Whether at this level there was that problem, I don't think it was shown. Sure, if you had a whole lot of moisture in there, that would probably cause more bridging. But keep in mind, the responsibility went to HASBAC to deal with that issue. That was HASBAC's job to maintain the corn, the grain, in good and acceptable condition. It's right in the contract. That's why we said when we dealt with the proximate cause issue, this is kind of a red herring, because this is HASBAC's job to deal with that. That's what they took on for themselves. Let me switch over briefly to the 414 case. I call the 414 claim a square peg in a round hole. This is not a 414 case. We were not the owner who passed down responsibilities to a contractor and kept some for ourselves. We were not a contractor who passed down responsibilities to a subcontractor and kept some for ourselves. In fact, there was no subcontractor in the case. We're going to call this a contractor, but there was no sub. For a contractor to have retained responsibility, it needed to have retained something from what it passed down to the sub. 414, I think as the Court has said in its own opinions, 414 is not retained control over desired ends. It is control over the means and methods of the work that was being done that was involved in the accident. Control of the operative details, the incidental aspects of the work. That's what control is. And it needed to be about the precise activity that was involved. And here, what was involved was emptying the grain bin. The Court has said, and it is the law, that the best indicator of control is the contract. And the contract here between HAZBAT and CGB kept the control in the hands of CGB. I'm sorry, of HAZBAT. HAZBAT retained the control. All those things we talked about before, I won't go through them again. HAZBAT kept those things for itself. The Court can certainly look to see whether from an operations standpoint the operation conflicted with the contract. But the fact of the matter is the operation was totally consistent with the contract. HAZBAT hired and fired and trained and supervised and ran its equipment and ran the bins and told the boys what to do. And that was testified by Schaffner, by his daughter, and by two of the boys who were nearly killed in this accident. Okay, thank you. You have the opportunity to make a vote. Thank you. Mr. Durkin. Thank you for having me on behalf of my clients. Your Honors, I think – yes, Your Honor, I'm very sorry. All I want you to do is center yourself in front of the microphone. Yes, I will do that. I apologize, Your Honor. I think the key piece of evidence that answers a lot of the questions about duty is the warehouse license. But before I get to that, I want to answer some of the questions you had about the moisture. What our expert said was that the standard in the industry was to set moisture levels at about 14 percent. CGB chose to do it at 16 percent. HAZBAT had no say whatsoever in the moisture levels of storage. And what our expert said was it's well known in the industry – he's an industry leader, and he said he spoke many, many times to CGB people, in fact, about topics on grain at various seminars. And it was a 16 percent setting that led to what brought him the condition in the bid. It's well known if you store something all year at 16 percent, you're going to get the clumping, the bridging, as you said. That was completely set by CGB because all the grain was, in essence, going to be their grain. It was either the farmer's grain, it was their grain that they bought from farmers, or these farmers, at some point, would have a contract to sell. And all the grain, virtually 100 percent of it, would then go to CGB in Savannah and be put on barges. So it's just the timing of the purchase has to do with the ownership. But all of it was going to be virtually grown. Now, when I get to the idea about the warehouse license, the reason I bring that up is, what's different than any single case I've read about duty is that in this case, bid number nine, and this was established through the first witness we called, Alan Smith, through Exhibit 1, who's the licensing manager for CGB, and happens to actually work in that office in Mount Carolina, that small office that's there, said that, and signed the licensing agreement, and said that bid number nine and all the grain elevator, the whole grain elevator, by the way, is the whole property. Okay? Bid number nine is one, and I'm sorry, I'm a city guy, I had to learn that myself early on, so I apologize if I'm explaining that, okay, and you knew that already. But the whole elevator is all the sheds, office, bins, conveyor system, legs, dryers, everything. Okay. And so the licensing agreement was signed by CGB, specifically Alan Smith, Exhibit 1 at the trial, and it said that bid number nine, Mr. Smith said this, was a licensed federal warehouse for grain storage, and there was one and only one operator of that warehouse, bid number nine and all the other bins, and that would have been CGB, and as a result of that, they were required, they were required to have exclusive legal and operational control of bid number nine at all times, 24-7. Where is the, or what is the source of this legal authority that you've just referred to? Is it federal law or is it state law or is it contained in the license itself? Well, Judge, there's a grain license that they're issued so that they can sell grain, okay, and that's under the United States Department of Agriculture, and they are licensed to sell and store grain at Mount Carroll and other facilities. There's a whole bunch of them that are covered by the license. My point is that you're claiming a duty based upon some legal authority, and I'm asking you, is it a federal statute, a federal regulation, or? Yes, Your Honor. Which is it? It's federal regulation. It's federal regulation, but I'm not saying the whole body of the license agreement has to do with the duty, but there's certain elements that they agreed on for bid number nine, and by the way, they contractually then in the facility agreement adopted that we will maintain the license. It's right in the facility agreement when they signed the lease on paragraph six of the facility, CGV will maintain, will provide the warehouse license. The warehouse license requires legal operational control at all times, and Mr. Smith said they were under that obligation for bid number nine. It was not delegable. It could not be delegated despite, you know, something in the brief. He definitely said it couldn't be delegated, and so did Professor Field unequivocally, and they stated in addition to have the warehouse license, you have to, when you have that license, you have to have facilities that have a clean and safe work environment. So the jury was able to hear about all these responsibilities that they had. How does this relate to the common law vis-a-vis the court, the restatement? Well, Judge, to common law, there's two things. One of the first questions was a relationship that we heard from, and it goes to the relationship for the common law duty, which is warehouse operator of bid number nine and people that were allowed by them who had control or were supposed to maintain control. In 414, it goes to control. Just like in the, I think the Kane case was a case where a summary judgment was affirmed out of Rockford, and one of the operative facts that was in the brief was that the contract said that the general contractor, this was by this court. Your Honor was on it, and Judge Burkett wrote the opinion, and one of the operative facts was that they specifically stated that the general contractor did not have operational control. Okay? In this case, you have the exact opposite, the exact opposite, so that the licensing agreement adopted into the contract for the facility said we have operational control at all times. Is it your contention that the defendant had operational control but didn't exercise it? That's correct, Your Honor. That's correct. They were required to do it both by the licensing agreement for bid number nine, which is a promise to the government that we're going to do this, and adopted in their lease agreement with Haasbach. Now, you see, when they use the words legal and operational control, and that's really the reason why they leased it back in its entirety. What happened was they sold it to Haasbach and then leased it back, the grain elevator facilities, back to CGB immediately because they needed to have legal control of the entire grain elevator to operate as a grain dealer in a grain storage company, and that's their business. So in terms of the facility lease agreement, there was talk about who did what, and actually the actual person who decided the moisture level in CGB, but also the mixing and blending, because that's really the key here, okay? That's the incidences of work. You see, the way the grain works is Mr. Schaffner testified he has really nothing to do with the grain unless Mr. Christine, the regional manager who's out there, tells him what to do. And he would come to him two or three times a day, and he'd say, I want to have corn mixed and blended. All Mr. Schaffner does is push a button, pull a lever, and do – that's all it is. This is a CGB operation. They are the operator, in essence, of this. When you come up there, the sign says CGB. There's no Haasbach. Haasbach, by the way, is one full-time employee who is a welder and a farmhand, okay? CGB is one of the most sophisticated grain companies in the world that own or lease or occupy thousands and thousands of bins. And they have specific rules that when they have a bin that they're in control of about how you go in the bin. You get a permit. You get a permit for it because they want to check the bin before. You have an occupant there, an observer. You have harnesses. And you never let 14-year-old, 19-year-old in there, okay? You never, ever, ever would do that. And that's what happened here because they did not exercise control over their operation and their facility. And they had the right – someone asked about the right to monitor. They had it right in the contract. We have the right to monitor all handling of the grain. And I asked the president of CGB, Mr. Beck, why they wanted that. And his testimony was very clear. We wanted to make sure if anything was being done wrong, we would stop it. So what the jury heard was he had a company who had contracted to control, was the bin operator, was supposed to be monitoring, but they turned their back. And there's no doubt that's why the jury found them negligent. And, you know what, when Judge Gutterson ruled at the end, he said, I think the evidence showed here, and the jury was entitled to find that this was an exceptionally dangerous situation that was largely created by consolidated, and consolidated exercised really complete dominion and control over the entire operation. In terms of – I want to go through some of the questions that counsel went. The warehouse – I think I've covered almost all of them. Well, he says, yes, our professor did say that the Warehouse Act is not a safety statute, so to speak, but that's kind of a – it's a big statute. It's a big regulation, a big body of rules. And one of them says have facilities that have a safe and clean work environment, okay? And I think that has to do with a work environment. Is it your point that CGB retained authority over this entire operation but did not exercise that authority, and that is the cause of the injuries here? That's correct. And that goes with 414. When you retain control over an operation and don't exercise that control in a reasonable manner, and that's what our contention is. Specifically, what did they fail to do? They failed to do anything, okay? So they retained control over the entire operation, and they failed to even inspect, check what was going on that day. They allowed people in a bin that they had control of, that they had control of. Well, how did they let people into that bin, these young men into that bin? Well, you know, they testified. How did they let it? They didn't stop anybody. They did not stop anybody. And what they – what we found was that the jury heard evidence – actually, they denied that they knew any children were out there, but the evidence was fairly overwhelming that they would have had the bin not – intentionally not looking, because it was the summer before – this was at least the third summer where young children of this age had come out there. And when they scale – when they're in a scale house all day, there's a big picture window, and the jury heard this, and it's facing directly to the ladder that goes up to the green bin, number nine. And what we called one of their employees, who said, we saw the young people, was his word, go up the ladder the summer before, and I don't know where they went when they got up to the top. Of course, right at the top is the bin, okay? And, you know, they could have – if they had found – this is a foreseeable thing, a great entrapment. It's well known in the industry of things happening like this. There's many, many a year, so it's foreseeable. So is it your point, then, that they did not follow the OSHA regulations with respect to putting people in the bin? That's correct, but more – almost more importantly, Your Honor, is they adopted their own regulations. On the bin, which Mr. Christine's testimony outlines. And they were – in addition to OSHA, they had a couple additional requirements that a CGB employee be present at all times, but most of their requirements were basically the same as OSHA. They had their own rules that they required contractors to sign if they were going to be working in the area. There's a form – it's in Exhibit number seven, if I remember correctly – and they never gave it to them, and that would have gone over all these rules, including bin entry rules. Didn't give it to whom? I'm sorry. They never gave it to HOSPAC. They never gave them their contract acknowledgement form, which I think is number – in my head, I'm trying to say seven. It was what the number of the exhibit is. So you – it is because they did not give HOSPAC the rules and regulations that they saw these young people climbing up the ladder and didn't do anything to stop it or ensure that they were harnessed properly? Is that the gist of your point? That is one gist of that point, along with they didn't exercise the control in a reasonable manner that they had retained in this by having – by being the warehouse operator for bin number nine, which was supposedly supposed to be 100 percent control 24-7 at all times. The regulation says at all times. Well, I guess my point is that had this entire bin of grain gone bad, it's a loss. There's – the grain is bad. It's too wet, too dry, not mixed properly, whatever it might have been. Yes, sir. But the issue is letting those young boys into that bin. Yes. What is it that they should have done that they did not do? They should have prevented – by enforcing their own rules, their own rules would not allow someone to come into the bin. At all. At all. Their own rules was no one would come into the bin without us issuing what's called a concealed – or a container permit. And they'd have to fill this permit out and say, we're going to go in here and we're going to have these safety people, we're going to have an attendant up here, we're going to harness people, and by no means are they ever going to walk down grain like they were doing in this case. Unless they're properly harnessed. That's correct. And they did not enforce their rules and they ignored it because they felt we passed it all over. But they really didn't. They really didn't. And that's why the jury – So that's really – that's the fork in the road. That's the fork in the road along with – but they did create the condition that led to this also, and that was brought out through Professor Field through the moisture levels that were set too high. The reason they set moisture levels too high is if you get 16 percent, it weighs more, okay, as opposed to 14 percent. And that's why they did it and that's why the farmers were critical of them. Kind of like putting water in ham? I think so, Your Honor. And I think that that's – you know, when you sell millions and millions of bushels of grain, you know, that makes a difference. Okay? So that was my – and I know Mr. Golden has a couple minutes. I have just one question. I had read that – is his name Crescent? Eric Crescent. Crescent, yes. That he was generally there on a daily basis. He was generally there on a daily basis. And was he there on that day in question? He was there in the morning, and I think he might have left, when they were moving grain according to Matt Schaffner, Your Honor. The testimony was when they're moving grain, which was – they're only moving grain at the request of CGB. They would not move grain unless CGB said we need the grain to load to Savannah, okay? They're – the only reason when they're moving grain, the testimony from Matt Schaffner was that he would be there two or three times a day, out in the outside. He might be there in the office all day, but he would be with him directing him two or three times a day. And he would tell him exactly what we were doing. My custom and practice would be I'm going to tell him exactly what we're doing. I don't remember specific conversations because he's human, but I would tell him what we were doing, where we would be, and that when they're moving grain two or three times a day was a testimony in the outside of the office, out by the bench. And it's in his direction to take the grain out of bin number nine? Absolutely. He said that he – he admitted it, but he said they would have – I told them to move the grain out. That's in his testimony. I would have told them. There's no – all Mr. Schaffner does is push buttons and pull levers at the request of Eric Christine. And he said, Mr. Christine, Mr. Christine – I'm sorry. I was going to add something, but I wasn't answering your question. I apologize. Good. Thank you. Thank you, sir. Thank you. Mr. Golden. Thank you. You still have three minutes. You'll probably get more. I'll try to be brief. A master lock probably costs around $5. If, in fact, Consolidated Grain had been fulfilling all the duties that they have and their knowledge of grain, it wouldn't have taken much to supervise this $5 padlock, the kind we use in our high school gyms when you're going to high school, would be put on the door so that if a kid is going to try to get in there or somebody's going to get in, they have to go first to the Consolidated Grain and Barge office. For the Consolidated Grain and Barge person, what's going on? Well, we're going to send some – well, where's the harness? Where's all that? If they had done the $5 padlock, two kids would have been alive today, and my client wouldn't have been scarred for life in terms of his being. So those are the things I'd like you to consider. Were there padlocks on all the other bins? Not to my knowledge. And those were not owned or controlled by the defendant here, correct? I don't know. I just know bin number nine was. My sense of it – well, my sense of it is Consolidated Grain and Barge ran the whole show. You know, I'm reminded of the Wizard of Oz. So the dog pulls back, Toto pulls back the curtain, and there's the wizard pulling all of the levers, making things go, and says, pay no attention to that man behind the curtain. In this case, it's Consolidated Grain and Barge people pulling all of the levers, saying, pay no attention to these men, Consolidated Grain and Barge men behind the curtain. And that was what was going on. That's all I have. Any questions? Well, he was only pulling levers. What about the buttons? I think in Hollywood they might have put buttons on a remake of the movie, too. Thank you. Mr. Esposito? Thank you. Mr. Esposito, all of the bins were controlled by – were included within that agreement, correct? Correct. CGB. Correct. All the bins. We didn't know a bin. We didn't control a bin. We had nothing to do with that. Matt Schaffner testified – claims conveniently ignored. He testified, CGB has its role. We have our role. We didn't cross. They did their thing. We did our thing. And our thing, meaning Hasback's thing, was to deal with the bins, was to empty the bins, was to fill up the bins. That was their job. It was not something that was – bin 9 was ours. We had no space whatsoever except the office, which is not involved in this case, that we would call our own. We didn't even have the space that Matt Schaffner had to set up his own personal business besides being the manager of this facility. That wasn't available to us. Let me go back, if I can, and talk about this warehouse agreement because I think they are misreading the agreement. If you go – the agreement itself is in Exhibit Volume 4. It's at page E1086. And if you go to page 241 of that document, it says – definitions. Control of the warehouse. Warehouse operators' ultimate responsibility for the operation and integrity of the warehouse storage facility by ownership, lease, or operating agreement. They point to that language and say, see, you are operating. We point to that language and say, no. It says we have ultimate responsibility. We cannot turn to a grain depositor who is getting back bad grain or not enough grain and say, don't blame us, blame HAZBAC. They were the ones who were operating it. The ultimate responsibility for this grain lied with us. But the definition itself recognizes that we can put in an operating agreement, and that's precisely what happened. We're dealing with an issue here, keep in mind, that happened five years post-sale. We owned this facility very, very temporarily, and we owned it in 2005. It was HAZBAC's job to train its employees. It was HAZBAC's job to supervise its employees. And it was HAZBAC, Matt Shatner, who told these boys, these poor boys, go up in the bin. They told them that after Shatner's own daughter refused to go back into a bin. So what does Shatner do? He turns around and says, well, you find me someone who will go in there. Mr. Esposito, what you're saying is true. Then it was HAZBAC who should have put the lock on the bin? Yes. If they wanted a lock, HAZBAC should have put the lock on it. Well, if they put the lock on the bin, how would your client have been able to access that bin? Your Honor, what our client does is it gives direction. It says, hey, we need to get so much grain out that it's going for sale. Get it out. HAZBAC can take off the lock if they wanted to take off the lock and get in with it. We don't access the grain for purposes of loading trucks or unloading trucks. Well, that's the job of Mr. HAZBAC. That's what you delegated to him. We didn't delegate to him. If there is a reference to a permit that is required by your client, if anyone goes inside or seeks to inspect the bin, does that clause exist somewhere in either the lease or some other contract between you and Mr. HAZBAC? I'm sorry I misunderstood the question, Your Honor. There's been reference during this oral argument about a permit that is required from your client if someone goes inside the bin. And that's incorrect. What the testimony was, Your Honor, is on our own property. CDB has properties in many places. And on our own property, on our own facilities, we wouldn't let anyone in a bin without the proper things being done. This wasn't our property. No. Didn't you lease the property? No. We leased it. I thought you said, or at least I thought I heard someone say, that in order for your permit to be valid, you had to lease the property. It's not correct. It's just not correct. And it's not in this agreement. Well, tell me what is correct. What is correct is HAZBAC owned the property, totally owned the property. We have the license to store grain of third parties, a license that would cover this warehouse, that HAZBAC was letting us operate our license on its own property. HAZBAC could have kept the property for itself, stored its own grain, and never would have needed a license. Never would have needed a license. The license coming in is because a grain dealer is storing the grain of a third party. And we didn't delegate anything, Your Honor. There was a contract, and under the contract— Would you have any ability to control what's in that bin if you didn't have some sort of legal interest in it? We had the ability because we were depositing our own grain, too, anywhere from 300,000 to 700,000 bushels of grain in a growing season. We were depositing that grain, and we would give directions. This was the agreement. I mean, we had the ability to get in because HAZBAC agreed that we can access the property. That's why we have this agreement. This was HAZBAC's land, HAZBAC's facility. We had a space allocation. We paid by the bushel. Other than the office lease, which we separately office leased on a monthly basis, depending upon how many bushels in, that was how we paid. We didn't have anything more than that. And the agreement makes very clear that that's how the payment structure runs. It's kind of like being a bank depositor. In a safety deposit box, you pay by the size of the box you have. You don't have any possessory interest in the land or the bank. You don't have any possessory interest in the bank itself. You're just allocated a bit of space, and you're paying for that space allocation. That's all we had here. Even with a deposit box, I believe there's a written contract, is there not? There is a written contract, sure, as there was here. And the contract here was very clear in how it defined the responsibilities. If I understand correctly, then, if your client had the license to store grain in that bin, then under what authority does Mr. HAZBAC have the right to store grain in that bin? HAZBAC owned it. I'm sorry? HAZBAC owned the facility. HAZBAC owned the whole thing. So there are no federal regulations that relate to what you can store in a bin? On your own property? No. They can store as much as they want in there. They have an unfettered right to store 1,500,000 bushels in a single year, and every year they can change that number up or down by about 200,000. But HAZBAC is not the one who needs it. So the storing of the grain has no effect on interstate commerce, is that what you're suggesting, and therefore regulations from the federal government wouldn't apply? There's no federal – a farmer storing grain on his own property – I thought they told us that he was a welder and a farmhand, not a farmer? Matt Schaffner was a farmer. He was employed by HAZBAC. HAZBAC, the LLC, he was employed by HAZBAC, but HAZBAC also allowed him to run a welding business on the site. Okay. So that's what the welding business is. I got most of the news.  Three of our six employees were not even there at the time of the accident. We sit in an office, unless we have to go out and give a ticket for the grain that has just been loaded or unloaded from a truck. This is not something that Schaffner comes and says, you know, I'm sending four boys into a bin. The fact of the matter is several years earlier, CGB went to HAZBAC and said, you know, Schaffner's daughter is 12 years old and she's coming out from underneath the tunnel. We think that's unsafe. And HAZBAC's response is, don't worry about it. They let her go in there. This was HAZBAC's operation, and this was HAZBAC's decision to send four boys into a bin, two of them to their death. There is no common law duty here. Essentially, Planeth is saying that five years after a sale, we have a duty to supervise the buyer's employees, to train the buyer's employees, to impose our rules on the buyer, to give them our rules. There's not a case in the world that says that. There is absolutely no duty whatsoever to these people. There is also no proximate cause. No one could foresee what happened here. They broke the chain of causation and broke it quite clearly. I thank you very much. Thank you. The case will be taken under advisement. The court is adjourned.